Lyle N. GULLICKSON, Plaintiff and
Respondent,

v.

NORTH DAKOTA WORKMEN'S COMPEN-
SATION BUREAU, Defendant and
Appellant.

No. 7661.

Supreme Court of North Dakota.

June 24, 1957.

Leslie R. Burgum, Atty. Gen., and P. M. Sand, Asst. Atty. Gen., for appellant.

Cupler, Tenneson, Serkland & Leahy, Fargo, for respondent.

GRIMSON, Chief Justice.

This matter arises out of an injury sustained on Oct. 31, 1953 by Lyle N. Gullickson, claimant and respondent, while employed in Harry's Meat Market in Fargo, North Dakota. Harry's Meat Market was covered by the Workmen's Compensation Fund. The injury occurred when the claimant, in the course of his employment, slipped and fell. On Dec. 28, 1953, he filed a claim with the Workmen's Compensation Bureau (hereinafter referred to as the Bureau) for medical expenses incurred in connection therewith. That claim was accepted without a hearing and paid.

On May 5, 1954, the claimant made another application for disability benefits and medical expenses which he claimed arose out of the same injury. That application was denied. Claimant then petitioned for a re-hearing which was granted. A re-hearing was held on Sept. 1, 1955 before O. T. Owen, Chairman of the Bureau, at which time evidence was introduced. Thereupon the Bureau made its findings of fact, conclusions of law and order for judgment denying the subsequent claim of May 5, 1954. The claimant, feeling aggrieved, appealed to the district court of Cass County. The district court tried the case upon the record that was made before the Bureau and came to the conclusion that the findings of the Bureau were not supported by the evidence. The court then made its own findings of fact, conclusions of law and order for judgment granting the claim of the claimant. From the judgment entered thereon an appeal was taken to this court by the Bureau and a trial de novo demanded.

The appeal specified a number of errors in the findings of the district court. The Bureau then summarizes the issues involved as follows:

"I. Did the court err under the provisions of Chapter 65–10 and particularly under Chapter 28–32 by not affirming the findings of fact, conclusions of law and order of the bureau and by substituting its own findings of fact, conclusions of law and order for that of the bureau? We contend the court erred.

"II. If under the provisions of Chapter 28–32 the court was legally justified to substitute its findings, conclusions and order for judgment are the findings supported by the evidence and the conclusions of law in accordance with the findings, and is the order for judgment in accordance with the law? We contend they are not."

The Workmen's Compensation Bureau is an administrative agency and cases against the Bureau are tried under the Uniform Practice Act, Chapter 28–32, NDRC 1943. Section 28–3219, NDRC 1943, provides:

"The court shall try and hear an appeal from a determination of an administrative agency without a jury and the evidence considered by the court shall be confined to the record filed with the court. * * * After such hearing, the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law * * * *or that the findings of fact made by the agency are not supported by the evidence, or that the conclusions and decision of the agency are not supported by its findings of fact.* If the decision of the agency is not affirmed by the court, it shall be modified or re-

828

versed, and the case shall be remanded to the agency for disposition in accordance with the decision of the court." (Emphasis Supplied.)

■ In Burkhardt v. State, 78 N.D. 818, 53 N.W.2d 394, this court construed that section to mean that "the District Court must review the evidence contained in the record, certified from the Bureau to determine whether the findings of fact, made by the Bureau are supported by the evidence and its decision is in accordance with law." Further this court in Feist v. North Dakota Workmen's Compensation Bureau, 77 N.D. 267, 42 N.W.2d 665, 666, held that:

"Under the statutes providing for an appeal from the decisions of the Workmen's Compensation Bureau it was incumbent upon the trial court to review the evidence to ascertain and determine whether the findings of fact of the Compensation Bureau were or were not supported by the evidence; and if the court found that the findings were not supported by the evidence then it was incumbent upon the court to render decision accordingly and to require that the decision of the Bureau be modified or reversed as the justice of the cause might require."

A further statement on the procedure under Chapter 28–32, NDRC 1943, is found in the following statement from Northern Pacific Railway Co. v. McDonald, 74 N.D. 416, 422, 23 N.W.2d 49, 52;

"By the provisions of Section 28–3219, R.C.1943, the district court, upon an appeal from the determination of an administrative agency, is directed to reverse or modify the decision of the agency if it finds, among other things, that 'the findings of fact made by the agency are not supported by the evidence.' Section 28–3221 provides: 'The judgment of the district court in an appeal from a decision of an administrative agency may be reviewed in the supreme court on appeal in the same manner as any case tried to the court without a jury may be reviewed, * * *.'

"Section 28–2732, R.C.1943, in so far as it is pertinent, reads as follows: 'On appeal in any action tried by the court, without a jury, whether triable to a jury or not * * *. The supreme court shall try anew the questions of fact specified in the statement or in the entire case, if the appellant demands a retrial of the entire case, * * *.'

"We think it is clear that these statutes, construed together, require a trial de novo * * * upon an appeal from the district court to this court where, as in this case, the statement of the case and the specifications of error demand a review of the entire case."

It is contended by the Bureau that the district court in reviewing the evidence erred in not finding it sufficient to sustain the findings of fact of the Bureau. The ground alleged is that there was a conflict in the claimant's evidence concerning which part of his body he fell on. The Bureau claims that taking one version thereof sustained its conclusion that the claimant was not entitled to compensation on his second application.

■ It is the Bureau's contention that it is its duty to evaluate the testimony that is in conflict and that its findings thereon should not be disturbed. According to Sec. 28–3219, NDRC 1943 and the interpretation thereof, as cited in the foregoing cases, it was the duty of the district court to determine whether the facts proven on the hearing are sufficient to sustain the findings of fact and conclusions of the Bureau. In doing so the court is not bound by the findings of the Bureau. It shall affirm them only when such findings are supported by substantial evidence. Steamship Terminal Operating Corporation v. Schwartz, 2 Cir., 140 F.2d 7.

The first finding of fact by the Bureau reads as follows:

"1. That on Oct. 30, or 31, 1953, the claimant while carrying out garbage on employer's premises, weighing 40 to 50 pounds, slipped and fell backwards striking the *right side of the body*." (Emphasis supplied.)

The evidence shows that the claimant, Mr. Gullickson, was employed as a meat cutter for Harry's Meat Market at Fargo, North Dakota. In preparing for closing the market on the evening of Oct. 31, 1953, he was carrying out 40 or 50 pounds of waste material to the garbage cans. As he went through the back door he fell. No one saw him fall. In his application, Dec. 28, 1953, for payment of medical expenses he described that accident as follows: "Was carrying out garbage when slipped and fell *on doorsill on my back*." (Emphasis supplied.) That was verified as correct by Henry Platt the owner of the market. The other employees helped him get up. Claimant immediately went to St. Luke's Hospital for examination. Dr. Hall, who examined him in his report described the accident as told him by the claimant: "Feet went out from under and I lit *on lower back* while carrying garbage." (Emphasis supplied.) Then in stating what he found Dr. Hall said: "Contusion, right lateral trunk (eccymosis)." There is no explanation of this contusion.

When the claimant made his application for compensation on May 5, 1955, he described his accident as follows: "Carrying out garbage and fell *on left hip*. No step." (Emphasis supplied.)

It is claimed that this was at variance with the first application as to the spot on his body on which he fell. We do not, however, consider it at variance but at the most particularizing the area involved. It points out the particular part of the "low back" on which he fell. A fall on the "low back" necessarily was a fall on both hips.

According to the Doctor's testimony a fall on the "low back" could affect either side. Dr. Swanson was asked: "Doctor, in relation to Dr. Hall's showing a bruise on the right side would you say that if a person takes a fall on his back and is bruised on the right side that does not exclude a shock to the left side which would cause the condition you describe?" Ans. "No, in this fall, we do not know just what happened. It would indicate from Dr. Hall's report that he fell on his right side but there is nothing in that report that would preclude the possibility that in falling he might have wrenched his left hip which could be just as bad as the contusion of the fall." He also testified: "The X-ray doesn't say anything about it. Where the X-rays were taken it gives his whole spine."

The only basis for the Bureau's claim that the fall was on claimant's "right side" was the statement by Dr. Hall in his report of "a contusion on the right lateral trunk." At the time the doctor made that report he knew and reported that the claimant said he fell on the "low back," and that the X-ray showed the whole spine. It is more likely that the doctor thought his statement that he found a contusion coincided with his patient's description of the accident than that he was trying to contradict him. If we visualize the circumstances of the fall as described by claimant his statement seems reasonable. He says he went out the back door carrying 40 or 50 pounds of garbage. He would naturally be leaning back to keep his balance. When stepping down out of the doorway he slipped, lost his balance and fell on his low back on the doorsill. In the hearing before the Bureau after his second application the claimant still maintained that he fell on his low back. He testified:

"Q. Now, on the day of this accident would you tell us what you were doing immediately prior to the accident? A. I was getting ready to clean up and I was cleaning up the garbage, to carry it out in the back to the garbage cans.

"Q. Was this a very heavy object?
A. Well, I suppose around fifty pounds, 40 to 50 pounds.

"Q. And tell us just what happened?
A. Well, I was walking out towards the back and I noticed quite a large step there but as I went down I slipped and fell right across my lower part of my back.

"Q. Would you stand up and describe where you took the brunt of the blow of the fall? A. Well, as my feet went out I just landed right on the lower part through here—

"Q. You are pointing to the low part of your back and the area between both hips and that is the top of your hip? A. That is right."

In effect he maintained the same account of his fall throughout.

An attack is also made on the testimony of the claimant in regard to a visit to St. Luke's Hospital on August 11, 1953. He claimed he did not remember that visit but he did not deny that he consulted doctors on account of some pains in his hip before the accident. He was asked:

"Q. And prior to this fall on or about Oct. 30, 1953, have you felt pain in hip?

"Ans. Occasionally but not to any extreme at all.

"Q. Enough so that you had sought medical advice on it?

"Ans. Yes."

There was no attempt to conceal the fact that he had consulted doctors on pains in his hip prior to his fall on Oct. 31, 1953. That he did not remember this occasion on August 11 is, perhaps, explained by Dr. Stafne's statement regarding that visit that "He also stated he had been drinking for several days." Claimant's lack of remembrance of that particular examination cannot be held to destroy his whole testimony as long as he willingly testified to the effect that he had consulted doctors on account of his hip before his October accident.

■ In reviewing the testimony as we must do on a trial de novo we do not find any real conflict for the Bureau or the court to decide. Nor is there sufficient evidence to sustain this Bureau's finding that the claimant fell "striking the right side of the body." The district court was clearly right in refusing to adopt the first finding of fact by the Bureau heretofore quoted.

■ The next two findings of the Bureau bearing on the issues which the district court failed to adopt are as follows:

"8. That the disability resulting in the surgery, known as 'Smith-Peterson cup arthroplasty' is the result of his arthritic condition not the result of the injury and fall which occurred on Oct. 30, or 31st. 1953.

"9. That the fall on Oct. 30 or 31st. 1953 did not aggravate the condition in the left hip."

We will now consider the evidence bearing on these findings.

The testimony of Dr. Stafne is to the effect that claimant had come to St. Luke's Hospital on August 11, 1953, complaining of a dull pain in the left leg starting in the groin and going down inside the leg to the foot * * * and that he had had some low backache on previous occasions. An X-ray of his "lumbar-sacral spine" was taken at that time. The report of that showed: "Negative lumbar spine and sacro-iliac joints, osteoarthritis changes both hips, more marked on the left, where there is some *flatening* of the femoral head and narrowing of the joint space, small shadow of calcification overlying the mid portion of the left kidney and a small calculus overlying the cortex of the rt. kidney."

The X-ray taken on Oct. 31, 1953, right after the accident shows:

"Lumbar spine.
"Slight narrowing of the lumbo-sacral interspace.

"Lumbar spine otherwise negative.

"Some *flatening* of the left femoral head and marginal sclerosis left hip joint with narrowed joint space-findings may be incident to old Perthes or slipped epiphysis or may simply represent osteoarthritic disease of the left hip. C. H. h."

The claimant stated that while he had pain in his hip prior to the fall on Oct. 31, 1953, it had not been continuous nor severe. He had been able to continue his work of carrying quarters and halves of beef and doing his work as a meat cutter. The testimony is that he was not drinking intoxicating liquors during the day or evening of the accident. He testified that when he fell on Oct. 31, he was stunned from the pain and kind of lost consciousness just for a minute. One of the clerks came out and helped him to get up. Leonhart Voelker, who worked with him in Harry's Market, recalls "that the appearance and expressions of Lyle Gullickson at the time he was seen lying on the floor immediately after the fall evidenced that he was in a great deal of pain and at that time was suffering from the effects of the fall." Claimant immediately reported at the clinic. He was then examined by Dr. Hall and the X-ray hereinbefore referred to, was taken. He was advised to go home and apply warm packs which he did. He returned to work the second morning after the accident but found that he could not stand it. Three weeks afterward he left that employment because he "just couldn't carry beef anymore at all. * * * My hip was getting so terrible." Then he went to Dr. Swanson, an orthopedic surgeon. After getting claimant's history and examining him Dr Swanson found that:

"He had an osteoarthritis of a degenerative change in the left hip which indicated that the cartilage was destroyed with sclerosis of the acetabulum and also with the hip protruding with some *flatening* which was giving him his disability."

It was then determined that an operation called "Smith-Peterson cup arthroplasty" should be performed on claimant. That is the placing of an artificial cup into the hip socket to form a plastic joint. That was done in late April 1954. He was not to bear much weight on his hip for the first six months. He got around in a chair for two months but could not do any work. In June 1955 he tried working at Dick's Market, found after a couple of days that his leg got so tired "it really ached" and that he could not do any lifting. At the time of the hearing he was trying to prepare himself for some sedentary work.

Thus it appears that the claimant had an arthritic condition prior to the fall on Oct. 31, 1953. That does not entitle him to compensation. Immediately after the fall that condition became worse and the operation "Smith-Peterson cup arthroplasty" had to be performed. The question then is whether it was the fall on Oct. 31, 1953 or the arthritic condition which caused the disability that necessitated the operation. On that Dr. Swanson testified as follows:

Mr. Serkland asked:

"Q. In your opinion, was the fall in any way responsible or causative in any way to the extent that it suggested or to some extent demanded the services referred to here as the arthroplasty?

"A. Well, the history is the thing we go by and also the clinical findings at the time. There is no question in my mind but that the injury precipitated the need for surgery. He probably would have gone on for years and not requested anything be done if he hadn't had this fall because this here report showed over a matter of months and previous to this time he had gone along doing heavy manual work with the degenerative changes in that hip joint, therefore there must have been a precipitating factor and I have to assume that the fall was the pre-

cipitating factor in leading him to seek medical aid."

Mr. Sand continued:

"Q. Doctor, if you can I would like to ask you this question, if you can give the answer. To what extent, if any, in your medical opinion, was the condition as you found it on April 22, 1954, due to the fall that he gave you by history and to what extent, if it is possible and if you can tell us, is the condition due to his disease which he had sometime prior to April 22, 1954, and also prior to October 31, 1953.

"A. There is no question in my mind that this man had an osteoarthritis or a degenerative disease of the hip and that this had existed for many years, that the precipitating factor in his disability was the fall and that he could probably have gone on for years without any disability unless something had aggravated or precipitated the acuteness of the condition in the hip joint."

The evidence clearly shows that claimant had a more or less dormant arthritic condition prior to Oct. 31, 1953. It, however, did not prevent him from carrying on his usual work including the lifting and carrying of quarters and halves of beef, and would not have done so if nothing had happened. After the fall, however, he began to suffer pains, especially in his left hip and had to give up his work. The pains increased to the extent that he had to have the Smith-Peterson cup arthroplasty operation performed. It follows that the operation was not the result of the arthritic condition, but that the fall aggravated that condition and made the operation necessary. In Pace v. North Dakota Workmen's Compensation Bureau, 51 N.D. 815, 826, 201 N.W. 348, 352, the deceased, for whose death the case was brought, had collapsed in the course of his employment. He had been suffering from arteriosclerosis. The court said: "Acceleration of a pre-existing disease to a fatal conclusion would, in such circumstances, be an injury within the Compensation Law." In Palmer v. Sample, 141 Neb. 36, 2 N.W.2d 583, 585, the plaintiff, in coming down a stairs in the course of his employment, slipped and "struck right in the middle of his back and rolled the rest of the way down the steps." Following that he was unable to work. The court said:

"The X-ray photographs disclose, according to the medical evidence, that plaintiff has for a long time had a dormant case of osteoarthritis of the vertebral column and while plaintiff may not have known anything about it at the time, yet as a result of the fall there was set up an acute traumatic arthritis, which is the cause of his pain and his present disability.

In Ray v. Department of Labor, 177 Wash. 687, 33 P.2d 375, 376, the court said:

"The fact that the claimant, at the time of the injury, had an arthritic condition which was dormant and inactive, would not justify the refusal of compensation. If that condition was lighted up and made active by the injury, then the condition was the result of the injury and not of the previous arthritic condition."

Clearly the evidence fails to support findings 8 and 9 of the Workmen's Compensation Bureau. The district court was justified in setting them aside and in finding that the accidental fall on Oct. 31, was the cause of claimant's disability by waking up that dormant arthritic condition.

The Bureau then raises the question of whether the court has correctly found the damages. The Bureau claims the evidence does not warrant the amount allowed by the court for damages.

Section 65-0515, 1953 Suppl. NDRC 1943, provides:

"In case of aggravation of an injury or disease existing prior to a com-

pensable injury, compensation, medical, hospital or funeral expenses, or death benefits, shall be allowed by the bureau and paid from the fund only for such proportion of the disability, death benefits, or expense arising from the aggravation of such prior disease or injury as reasonably may be attributable to such compensable injury. But any compensation paid on the basis of aggravation shall not be less than ten dollars per week unless the actual wages of claimant shall be less than ten dollars, in which event the actual wages shall be paid in compensation."

Section 65–0511, 1953 Suppl. NDRC 1943, provides:

"The weekly compensation for total disability shall not be more than thirty-one dollars and fifty cents, except where an allowance for dependents is made in compliance with Section 65–0509, nor less than fifteen dollars. This provision shall be applicable to all permanent total disability awards from the effective date of this Act [July 1, 1953]. The weekly compensation for partial disability shall not be more than thirty-one dollars and fifty cents."

Section 65–0512, 1953 Suppl. NDRC 1943, provides:

"If the injury causes permanent partial disability, the percentage which such disability bears to total disability shall be determined, and the fund shall pay to the disabled employee a weekly compensation in the sum of twenty-two dollars per week for the following periods: * * * For a fifty percent disability ...... 250 weeks; * * *."

The evidence shows that the claimant was earning $65 per week at Harry's Market and was the father of a minor, dependent child. Within three weeks after the injury the claimant had to cease all work because of the pain and suffering re-sulting after the fall. According to the testimony the arthritic condition would not have so disabled him. As a result of the fall, according to the evidence he was unable to work at least until June 1st, 1955. That establishes a period of total disability induced by the awakening of the arthritic condition by the accidental fall. The evidence shows that disability extended for a period of 80 weeks. The maximum allowance for total disability, according to Sec. 65–0511 is $31.50 per week. That was the allowance made by the district court. In addition to that an allowance of $2.80 per week was made for the same length of time for the minor dependent under the age of 18 years as provided in Sec. 65–0509, 1953 Supp. NDRC 1943. The district court also allowed all the medical bills incurred and $300 for attorney fees. The evidence is sufficient to sustain all such allowances and they are confirmed.

In addition to that the court allowed 50 percent partial, permanent disability from June 1, 1955, for a period of 250 weeks, plus the sum of $2.80 per week while his dependent minor child was under the age of 18 years. There was not sufficient evidence before the district court to make such determination. While the claimant was unable to work until June 1, 1955, there is no sufficient showing what his partial disability would be after that.

The court has established the liability of the Bureau for payment of partial permanent disability to the claimant in proportion to what the evidence may warrant. Sec. 65–0512, 1953 Supp. NDRC 1943. This can be established by the Bureau on taking further testimony as to his present disability and outlook for the future.

The case is therefore remanded to the district court with instructions to return the case to the Bureau for the purpose of determining the extent of the partial, permanent disability suffered by the claimant. Such determination to be made after a

hearing at which the claimant has had an opportunity to be heard.

In all other respects the judgment of the District Court is affirmed.

BURKE, MORRIS, SATHRE and JOHNSON, JJ., concur.