**GEO. E. HAGGART, INC., Appellant,**

v.

**NORTH DAKOTA WORKMEN'S COM-
PENSATION BUREAU and Melvin
Ziegler, Respondents.**

No. 8531.

Supreme Court of North Dakota.

Sept. 26, 1969.

Nilles, Oehlert, Hansen, Selbo & Magill, Fargo, for appellant.

David L. Evans, Asst. Atty. Gen., Bismarck, for respondent North Dakota Workmen's Compensation Bureau.

Robert A. Alphson, Grand Forks, for respondent Melvin Ziegler.

ERICKSTAD, Judge (on reassignment).

George E. Haggart, Inc., hereafter referred to as Haggart, appeals from a judgment of the District Court of Grand Forks County dated March 2, 1966, affirming an order of the Workmen's Compensation Bureau of November 9, 1964, which determined that the claimant, Melvin Ziegler, was permanently and totally disabled.

Before this award and judgment the Bureau, by order dated September 27, 1962, had awarded Mr. Ziegler $2,900.31, of which $2,214 represented temporary total

disability payments for 52 weeks and 5 days. This award arose from the same employment and claim as that involved in the order and judgment of November 9, 1964.

In Mr. Ziegler's initial claim with the Workmen's Compensation Bureau dated November 7, 1961, he asserted that while employed by Haggart on July 14, 1961, he worked inside a large pipe 16 feet deep in the ground; that there was a cold draft coming through the pipe; that there was a great difference in temperature between the surface of the ground, where he worked part of the time, and the pipe, in which he worked part of the time; and that from this difference in temperature he acquired a severe case of pneumonia which later brought on thrombophlebitis of the right leg.

On September 16, 1963, the Bureau determined that Mr. Ziegler was permanently and totally disabled. When Haggart was informed of this decision, it demanded and obtained a rehearing.

In its application for a complete rehearing Haggart sought a rehearing on (1) whether the pneumonia was fairly traceable to Mr. Ziegler's employment; (2) whether the thrombophlebitis was fairly traceable to the pneumonia or fairly traceable to his employment; and (3) whether they were preexisting conditions.

At the rehearing Haggart contended that the pneumonia which first hospitalized Mr. Ziegler was not caused by his employment; that from the first hospitalization for pneumonia he suffered no thrombophlebitis; and that only after a second hospitalization for pneumonia did he suffer from thrombophlebitis and only then was he disabled. Notwithstanding this contention and evidence submitted in an attempt to prove it, the Bureau reaffirmed its decision that Mr. Ziegler was permanently totally disabled and that his injuries were received in the course and scope of his employment by Haggart. The trial court affirmed the decision of the Bureau, and it is from the judgment entered on the trial court's order that Haggart appeals, demanding trial de novo.

Haggart does not deny that Mr. Ziegler is permanently totally disabled. It does, however, contend on this appeal, as it did before the Bureau and the trial court, that Mr. Ziegler's disability did not arise from his employment by Haggart.

A part of our Administrative Agencies Practice Act which relates to this appeal reads:

28-32-15. Appeal from determination of agency—Time to appeal—How appeal taken.—Any party to any proceeding heard by an administrative agency, except in cases where the decision of the administrative agency is declared final by any other statute, may appeal from such decision within thirty days after notice thereof has been given, or if a rehearing has been requested as provided herein and denied, within thirty days after notice of such denial has been mailed to him. * * *

North Dakota Century Code.

Section 65-05-03 provides that the decisions of the Workmen's Compensation Bureau within its jurisdiction are final except as provided in chapter 65-10. The pertinent part of that section reads:

The bureau shall have full power and authority to hear and determine all questions within its jurisdiction, and its decisions, except as provided in chapter 65-10, shall be final and shall be entitled to the same faith and credit as a judgment of a court of record.

In 1961 chapter 65-10 provided only for an appeal by the claimant. The pertinent parts of § 65-10-01 then read:

65-10-01. Appeal from decision of bureau.—If the final action of the bureau denies the right of the claimant to participate at all in the fund on the ground that the injury was self-inflicted, or on the ground that the accident did

not arise in the course of employment, or upon any other ground going to the basis of the claimant's right, or if the bureau allows the claimant to participate in the fund to a lesser degree than that claimed by the claimant, if such allowance is less than the maximum allowance provided by this title, the claimant may appeal to the district court of the county wherein the injury was inflicted. * * * Such appeal shall be taken in the manner provided in chapter 28–32 of the title Judicial Procedure, Civil. * * *

North Dakota Century Code.

It is interesting that even in 1961 § 65–09–03 provided for an appeal by an uninsured employer, but it was not until 1963 that the legislature permitted the insured employer to appeal a decision of the Bureau. See Laws of North Dakota 1963, ch. 427, § 3. As Haggart was an insured employer, it did not have the right to appeal from the September 27, 1962, award.

It is Mr. Ziegler's position that the 1962 decision of the Bureau is res judicata of the nature of the injury and its work-connection. It is his view that, although the order described the nature of the injury merely as pneumonia, the use of the term *pneumonia* was merely to indicate the initial disabling cause, as evidence submitted at the hearing discloses that if he was disabled for the 52-plus weeks as the order finds, it was not from the pneumonia alone but also from its aftereffect, thrombophlebitis, and thus that the 1962 decision established that he suffered from pneumonia and thrombophlebitis as the result of his employment by Haggart.

In support of his position he refers us to a statement in Arthur Larson's work on the law of workmen's compensation:

In a reopening proceeding, the issue before the board is sharply restricted to the question of extent of improvement or worsening of the injury on which the original award was based. If the original award held that there was no connection between the accident and claimant's permanent disability, there is nothing to reopen, and claimant cannot retry the issue of work-connection through the device of a reopening petition. Conversely, when the employee reopens to show increased disability, the insurance carrier cannot raise the basic issue of liability. * * *

2 A. Larson, The Law of Workmen's Compensation § 81.32, at 333 (1968) (footnotes omitted).

Haggart, however, contends that § 65–05–04 prevents any decision of the Bureau from ever becoming res judicata of any issue. That section reads:

65–05–04. Bureau has continuing jurisdiction over claims properly filed.— If the original claim for compensation has been made within the time specified in section 65–05–01, the bureau at any time, on its own motion or on application, may review the award, and in accordance with the facts found on such review, may end, diminish, or increase the compensation previously awarded, or, if compensation has been refused or discontinued, may award compensation.

North Dakota Century Code.

In support of its position it refers us to the following statement in American Jurisprudence:

Moreover, where a compensation commission is invested with continuing jurisdiction over claims, it has been held that it may revoke an award theretofore made, upon ascertainment of any facts going to the basis of the claimant's right, whenever in its opinion such revocation is justified.

58 Am.Jur. Workmen's Compensation § 508 (1948) (footnote omitted).

The case cited in support of this reference is that of Industrial Commission v. Dell, 104 Ohio St. 389, 135 N.E. 669, 34 A.L.R. 422 (1922).

In this respect we note that Chief Justice Christianson, speaking for our court only seven years after our workmen's compensation act was passed, pointed out that many of the sections of that act were taken from the Ohio workmen's compensation act. Crandall v. North Dakota Workmen's Compensation Bureau, 53 N.D. 636, 207 N.W. 551 (1926).

It would serve little purpose for us to cite the many decisions of this court in which it has been held that the Workmen's Compensation Bureau has continuing jurisdiction to modify its awards, but it should be noted that as recently as 1963 this court recognized the Bureau's continuing jurisdiction. Knutson v. North Dakota Workmen's Compensation Bureau, 120 N.W.2d 880, 883 (N.D.1963).

■ There appears to be nothing in our statute and no case law in our state which limits the Bureau to reopening an award only upon proof of a change in the claimant's condition. Accordingly, we must hold that the 1962 award was not res judicata of any issue, and that therefore when the Workmen's Compensation Bureau, in response to Haggart's petition for a rehearing of the 1963 award of permanent total disability, granted the petition, and at the hearing permitted Haggart to go into all the issues, not just that of whether the injury was temporary or permanent, the case was before the Bureau just as though those issues were being faced for the first time.

Notwithstanding that fact, following the rehearing the Bureau, in November 1964, merely executed an order affirming that Mr. Ziegler was permanently totally disabled. What the Bureau was affirming was in effect its previous resolution of September 16, 1963.

In neither the resolution nor the affirmation of the resolution did the Bureau set forth separate findings of fact and conclusions of law upon which it based its decision, which it should have done, pursuant to § 28–32–13.

The Bureau, before making the permanent disability award, apparently also failed to serve written notice upon the employer, pursuant to § 65–05–03.

Neither of these failures has been argued by the employer as a basis for relief, and as the employer has now had notice and has had ample opportunity to present evidence supporting its position, and as it is now quite obvious, following the second hearing, that the Bureau believes that Mr. Ziegler's thrombophlebitis resulted from the pneumonia and that his pneumonia resulted from his work, we shall assume, so that we may reach the merits of this case, that the Bureau has definitely determined that Mr. Ziegler first suffered from pneumonia and then thrombophlebitis as a result of his work with Haggart and that they have permanently and totally disabled him.

We can see no benefit in remanding the case so that the Bureau could properly so state, pursuant to the provisions of § 28–32–13. There is precedent, no doubt, for remanding the case so that the statutes could be properly complied with, but in this case that would result only in additional delay. A precedent for ignoring the procedural defects is Bernardy v. Beals, 75 N.D. 377, 28 N.W.2d 374 (1947), in which Judge Morris, speaking for this court, found similar procedural defects to be censurable but not jurisdictional. In his words, "Our regard for the expedition of justice prompts us to go directly to the merits."

But before we consider the merits, in light of the right of appeal which the insured employer now has, we think it important that we consider what the scope of review in the Supreme Court should be.

■ Incidentally, from a procedural standpoint, on Haggart's appeal from the November 9, 1964, decision of the Bureau affirming its previous order awarding permanent total disability, the district court is-

sued its findings of fact, conclusions of law, and order for judgment on March 1, 1966, affirming the Bureau's award of permanent total disability, specifically finding that Mr. Ziegler's disability was related causally to and fairly traceable to pneumonia and thrombophlebitis caused by his employment by Haggart. It is from the judgment of March 2, 1966, entered upon those findings of fact, conclusions of law, and order for judgment that Haggart now appeals to this court.

Haggart has demanded a trial de novo in this court, and it is this demand that causes us to consider the scope of review in this court.

When the Workmen's Compensation Act was first enacted in 1919, all jurisdiction of the courts over the causes contemplated by the Act were abolished except as provided in the Act itself, as indicated by § 1:

> The State of North Dakota, exercising herein its police and sovereign powers, hereby declares that the prosperity of the state depends in a large measure upon the well-being of its wage workers, and, therefore, for workmen injured in hazardous employments, and their families and dependents, sure and certain relief is hereby provided regardless of questions of fault and to the exclusion of every other remedy, proceeding or compensation, except as otherwise provided in this Act; and to that end all civil actions and civil causes of action for such personal injuries and all jurisdiction of the courts of the state over such causes are hereby abolished, except as in this Act provided.

Laws of North Dakota 1919, ch. 162, § 1.

Section 17 provided that the decisions of the Bureau on all questions within its jurisdiction should be final except when the Bureau denied the right of a claimant to participate at all in the Workmen's Compensation Fund. The pertinent part of that section reads:

> The Bureau shall have full power and authority to hear and determine all questions within its jurisdiction, and its decision thereon shall be final. Provided, however, in case the final action of such Bureau denies the right of the claimant to participate at all in the Workmen's Compensation Fund on the ground that the injury was self-inflicted, or on the ground that the accident did not arise in the course of employment, or upon any other ground going to the basis of the claimant's right, then the claimant, within thirty (30) days after the notice of the final action of such Bureau, may, by filing his appeal in the district court for the county wherein the injury was inflicted, be entitled to a trial in the ordinary way. * * *

Laws of North Dakota 1919, ch. 162, § 17, at 271.

It should be noted that upon appeal to the district court the trial was to be "in the ordinary way." The original act did not specify the scope of review in the Supreme Court. We observe, however, that as early as 1923 this court held that an appeal in a workmen's compensation case was not triable de novo in the Supreme Court. Gotchy v. North Dakota Workmen's Compensation Bureau, 49 N.D. 915, 194 N.W. 663, 667 (1923).

In 1935, § 6 of ch. 286 amended § 17 of the original act by providing that appeals to the Supreme Court should be de novo. The pertinent part of that section reads:

> Either party shall have the right to prosecute error as in the ordinary civil cases, and appeals to the Supreme Court in such cases shall be triable de novo.

Laws of North Dakota 1935, ch. 286, § 6.

In 1941 the Administrative Agencies Uniform Practice Act was enacted. Under the procedure prescribed by §§ 17 and 18 of ch. 240 of the 1941 session laws, in proceedings before an administrative agency, all evidence must be adduced in the hearing before the agency. These provisions are

now contained in N.D.C.C. §§ 28–32–17 and 28–32–18, respectively. The scope of review in the district court was set out in § 19, now N.D.C.C. § 28–32–19, and in the Supreme Court by § 21, now N.D.C.C. § 28–32–21. Neither of these sections has been amended since 1941, and both are quoted farther on in this opinion.

When the code was revised in 1943, § 65–1001 (now N.D.C.C. § 65–10–01) provided that appeals shall be taken in the manner provided in ch. 32 of the title Judicial Procedure, Civil. The reviser's notes indicate that this was done to conform to ch. 240 of the 1941 session laws, which prescribes uniform rules of practice for administrative agencies.

So the pertinent sections for our considderation of the scope of review today are § 65–05–03, which had as its origins § 17 of ch. 162 of the 1919 session laws and § 6 of ch. 286 of the 1935 session laws, and § 65–10–01, which had as its origins the same statutes, both sections being part of the Workmen's Compensation Law; and §§ 28–32–17, 28–32–18, and 28–32–19, which had as their origins §§ 17, 18, and 19 of ch. 240 of the 1941 session laws, the Administrative Agencies Uniform Practice Act.

Although many specifications of error were asserted in the notice of appeal, the argument in this case has been reduced basically to an issue of facts. That being the case, we think the provisions of § 28–32–19 are especially pertinent:

> 28–32–19. Scope of and procedure on appeal from determination of administrative agency.—The court shall try and hear an appeal from the determination of an administrative agency without a jury and the evidence considered by the court shall be confined to the record filed with the court. If additional testimony is taken by the administrative agency or if additional findings of fact, conclusions of law, or a new decision shall be filed pursuant to section 28–32–18, such evidence, findings, conclu-

sions, and decision shall constitute a part of the record filed with the court. After such hearing, the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law, or that it is in violation of the constitutional rights of the appellant, or that any of the provisions of this chapter have not been complied with in the proceedings before the agency, or that the rules or procedure of the agency have not afforded the appellant a fair hearing, *or that the findings of fact made by the agency are not supported by the evidence, or that the conclusions and decision of the agency are not supported by its findings of fact.* If the decision of the agency is not affirmed by the court, it shall be modified or reversed, and the case shall be remanded to the agency for disposition in accordance with the decision of the court. (emphasis added)

North Dakota Century Code.

In this case the trial court, in affirming the Workmen's Compensation Bureau, in effect found that the findings of fact made by the Bureau were supported by the evidence, and that the conclusions and the decision of the Bureau were supported by its findings of fact.

Section 28–32–19 must be considered in light of § 28–32–21:

> 28–32–21. Review in supreme court. —The judgment of the district court in an appeal from a decision of an administrative agency may be reviewed in the supreme court on appeal in the same manner as any case tried to the court without a jury may be reviewed * * *.

North Dakota Century Code.

In 1957, in Gullickson v. North Dakota Workmen's Compensation Bureau, 83 N. W.2d 826 (N.D.1957), for the first time in a workmen's compensation case involving an insured employer (relying on a Public

Service Commission case, Northern Pacific Railway Co. v. McDonald, 74 N.D. 416, 23 N.W.2d 49, 52 (1946), which construed the provisions of N.D.R.C.1943 §§ 28–3219, 28–3221, and 28–2732 as requiring a trial de novo in both the district court and the Supreme Court upon appeal), this court seemed to try the case as an ordinary de novo case is tried.

However, we are now inclined to believe that a trial de novo in the district court on the record made before the administrative agency and in this court on an appeal from the district court, as it relates to a determination of the facts, should be limited to determining whether there is substantial evidence to support the administrative agency's findings of fact. Any other construction of the statutes ignores the provision of § 28–32–19 which requires that after a hearing on an appeal from a decision of an administrative agency, the court shall affirm the decision of the agency unless it shall find that the findings of fact made by the agency are not supported by the evidence.

If the provision in § 65–01–01 (originally § 1 of ch. 162 of the 1919 session laws) abolishing jurisdiction of the courts over workmen's compensation cases and the provision in § 65–05–03 (originally § 17 of ch. 162 of the 1919 session laws) making decisions of the Workmen's Compensation Bureau final are to have any meaning, § 28–32–21, providing for review in the Supreme Court, must be construed so as not to substitute the judgment of the Supreme Court for the judgment of the Workmen's Compensation Bureau.

This will not be the first time that this court has stated and applied the substantial evidence rule to appeals in administrative agency proceedings, for only one year before *Gullickson*, this court, in a Public Service Commission case, said:

This court has held that the courts do not have the jurisdiction, primarily, to decide administrative questions assigned to the public utilities commission (PSC) for determination and where such commission in its proceedings furnishes due process of law and there is substantial evidence to support the findings of the commission, the courts have no authority to substitute their judgment for that of the commission. Application of Theel Bros. Rapid Transit Co., 72 N.D. 280, 6 N.W.2d 560; Application of Ditsworth, 78 N.D. 3, 48 N.W.2d 22. See also Great Northern Ry. Co. v. McDonnell, 77 N.D. 802, 45 N.W.2d 721.

Williams Electric Co-op., Inc. v. Montana-Dakota Utilities Co., 79 N.W.2d 508, 515 (N.D.1956).

For our most recent statement and application of the substantial evidence rule in a public service commission case, see Application of Otter Tail Power Company (Cass County Electric Co-op. v. Otter Tail Power Co.) 169 N.W.2d 415 (N.D.1969).

Current thought supporting the view that judicial review of administrative agency decisions should be limited is contained in American Jurisprudence:

The general frame of the power of judicial review is to keep the administrator within the valid statute which guides him and keep him from unreasonable excesses in the exercise of his function, and to ascertain whether there is warrant in the law and the facts for what the administrative agency has done, the court being limited to questions affecting constitutional power, statutory authority, and the basic prerequisites of proof. The primary limitation upon the power of the court to review is in regard to matters calling for the exercise of expert judgment which are committed to the discretion of the administrative agency. Thus, judicial review is extremely limited in regard to findings of fact and to expert judgments of an administrative agency acting within its statutory authority. The courts must not usurp the functions of the administrative agency nor intrude upon the domain which the legislature has entrusted to the agency. (footnotes omitted)

2 Am.Jur.2d Administrative Law § 612, at 453–454 (1962).

Further, it is interesting to note what the next section of the same work says about the constitutional necessity for such limited review:

> Generally, the legislature is precluded from imposing nonjudicial powers upon the courts, and the doctrine of the separation of powers prohibits the legislature from providing for a review which is too intensive—a review which in fact would constitute the delegation of nonjudicial functions to the judiciary. Upon review of action of an administrative agency, the court is confined to determination of judicial as distinguished from administrative questions, and the very nature of the judicial function itself limits judicial review of action administrative or legislative in nature. (footnotes omitted)

2 Am.Jur.2d Administrative Law § 613, at 454 (1962).

We recently had some experience with this constitutional necessity principle, when we found it necessary to declare an annexation statute unconstitutional, as a delegation of nonjudicial duties to the courts. See City of Carrington v. Foster County, 166 N.W.2d 377, 385 (N.D. 1969).

Accordingly, we shall examine the evidence in this case to determine whether there is substantial evidence to support the finding of the Bureau that Mr. Ziegler incurred pneumonia and, subsequently, thrombophlebitis in the course and scope of his employment with Haggart.

Mr. Ziegler testified that he started to work for Haggart on May 18, 1961, and that his work consisted mainly of setting grade until the last three days of his employment, when he acted as a pointer in the construction of a storm sewer at the Grand Forks Airbase. His complaint stated, and he testified at the hearing before the 1962 award, that his last day of work for Haggart was July 14, 1961, whereas it developed that his last day of work was actually July 12, 1961; but in any case, it is clear that he worked as a pointer for three consecutive days during July 1961 just before his contraction of pneumonia, for which he was hospitalized on July 17. Some pertinent testimony concerning Mr. Ziegler's employment and the occurrence of his illness, given at the second hearing, covering the last three days of his employment, reads:

Q. * * * What was the nature of your work?

A. Starting at 7:00 in the morning—well, there was no ditch open, so we had to wait until they opened the ditch until they started digging. They had dug a little ditch before, and we had to shovel dirt in on the sides of the pipes and tamp them down.

Q. What else did you do?

A. And, after they had a couple—they had dug about three lengths of pipe—and then they laid three lengths of pipe, and then you'd have to crawl back in and point them up. They never laid—dug one—for one length of pipe at a time—it was always around two and three lengths—one pole with a backhole.

Q. So that they were laying three at a time?

A. Three at a time.

Q. And when you muddied up these joints, you went back three lengths?

A. That's correct.

Q. And would you describe the conditions in there?

A. It was cold—cool and cold in there and drafty.

Q. And what was your own feeling at that time, how did you—were you perspiring?

A. Yes, definitely.

Q. Did you stay in the tunnel all the time?

A. No, I was in and out.

Q. Now when you're in the tunnel, what would you be doing?

A. I'd be muddying up the pipes inside—sealing the cracks, and when I was outside, then I'd seal the outside joints.

Q. And was there a difference in temperature from the inside to the outside of the pipes?

A. I'd say there was a great difference.

Q. There is a great difference between inside and outside?

A. That's right.

Q. And did you ever during the day go to the surface to work?

A. Yes.

Q. How did you get up there?

A. On a ladder.

Q. And what would you do up there?

A. Up there. Shovel dirt on the side of the pipe, when they were digging the next—while they were digging the next—while they were digging for the next pole—it took them about a half hour—sometimes longer.

*    *    *    *    *    *

Q. Now when you quit on the 12th—what happened—what happened that day?

A. That day—I really didn't feel too good that morning when I went to work.

Q. On Monday and Tuesday of that week, what were you doing?

A. I was doing the same type of work.

Q. You were doing the same type of work?

A. I started when they laid the first pipe on that part of the storm sewer.

Q. Okay—what time did you quit work on the last day that you worked on the week of the 10th?

A. I'm sure it was 5:30.

Q. Uh huh—is that the general quitting hour?

A. Yeah.

Q. How did you feel at that time?

A. I didn't feel very good.

Q. Describe your condition.

A. I was—I don't know—I just felt chilled, cold—I just didn't feel good.

Q. Then what happened? You went home. * * *

A. I went home.

Q. What did you do there?

A. Well, I tried to eat supper and I couldn't—went to bed and I stayed there until the following Monday—when my wife insisted that I go to the Doctor—I thought I'd get better.

Q. The following Monday, that was the 17th of July, 1961?

A. That's correct.

Q. You went to see Dr. Marshall?

A. That's right.

Q. And you were put in the hospital?

A. That's correct.

Q. With pneumonia?

A. That's right.

Q. Describe your condition between July—the last day you worked the week of July 10th and the time you went to the hospital.

A. Well ah—I was chilled, cough, I just generally felt bad—I hurt all over.

Q. Did you stay * * *

A. I stayed at home—right in the house.

Q. Hu huh. How long were you in the hospital?

A. I was in the hospital five days.

Q. From July 17th to August 22nd?

A. That is correct.

Q. And during that time, you were treated for pneumonia?

A. That's correct.

Q. And then—what did you do?

A. Well I came home and ah–I just couldn't seem to get better, it didn't want to get better.

Q. When did you first notice the pain in your leg?

A. About 10 days later.

Q. Later from what?

A. From the day I left the hospital—week to ten days.

Mrs. Ziegler corroborated her husband's testimony to the effect that he came home ill the last day of his employment for Haggart and that he stayed home, running a fever, with chills, until he was hospitalized at the Deaconess Hospital in Grand Forks on July 17. She further testified that he started complaining of his right leg shortly after he got out of the hospital the first time and that on doctor's orders she put hot packs on his legs.

Both Mr. Ziegler and his wife testified that before his employment with Haggart his health was good.

Five medical doctors testified in this case.

Dr. William Keig testified in response to a hypothetical question aimed at determining whether the pneumonia diagnosed on July 17 was traceable to Mr. Ziegler's employment. The question follows:

Assume that in July–on or about July 12, 1961, that Melvin Ziegler was working in a ditch approximately 17 feet deep and at the bottom of that ditch was a sewage pipe about three feet in diameter, and that they lay the pipe down and he would cement the joints together in the pipe, that there is a differential in the temperature in the pipe and that on the surface, that the surface temperature

was warmer than the temperature in the pipe, and that he was working in there and perspiring and then he would work part time inside the pipe and part time outside the pipe, and that according to his testimony, there was a draft in there, and that–that day–July 12, that evening he went home sick. He had complaints of feeling bad and the next day he developed a temperature, cough and generally felt sick, and he was that way from the morning of the 13th at home until he was admitted to the hospital on the 17th of July, 1961, and there his condition was diagnosed as bronchopneumonia. Based upon your examination of the claimant, Mr. Ziegler, and based on the assumed facts which I have stated to you, are you able to give an opinion which would enable you to state with reasonable medical certainty, whether or not the working conditions I just mentioned caused or contributed in your opinion to the pneumonia which was found on July 17, 1961?

His answer follows:

In my opinion, it's probable that the pneumonia was caused by the working conditions, at the very least, it certainly was highly contributory and  *  *  *

Dr. Keig was then asked a hypothetical question designed to determine whether the thrombophlebitis resulted from the pneumonia and consequently from Mr. Ziegler's employment:

*  *  *  [B]ased upon the same assumed facts and carrying the assumption a little further, assume that Mr. Ziegler was confined to the hospital from July 17, 1961, to July 22, 1961, and then was discharged—that he was subsequently seen at the office of Dr. Marshall with persistent pulmonary infection, and that about a week or ten days after his discharge from the hospital, he developed or began noticing a pain in the leg and that on October–and he complained of this to Dr. Marshall, and on October 1 or on October 3, he was seen by Dr.

Dailey and his condition of the leg was then diagnosed as thrombophlebitis. Based upon your examination and based upon the facts that I have given you in the hypothetical question, are you able to give an opinion which would enable you to state with reasonable medical certainty whether or not the pneumonia and the hospitalization for the same caused or contributed in your opinion under those conditions to the subsequent development of thrombophlebitis in the leg.

In response to this question, after numerous objections had been made and questions raised by counsel for Haggart intended to indicate that thrombophlebitis can result from trauma and other things, Dr. Keig made these statements:

My opinion is based on the fact that stasis is one of the principal causes of thrombophlebitis. Thrombophlebitis is frequently associated with or a complication of a severe infection or hospitalization for any cause * * * There was no reason to assume that thrombophlebitis or phlebitis was caused by anything else—I think it was highly probable that it was due to the infection of the pneumonia from the stasis of lying in bed.

Notwithstanding that counsel for Haggart posed a hypothetical question based upon Haggart's view of the facts that varied from the testimony of Mr. Ziegler, which was to the effect that Mr. Ziegler had lost twenty-five pounds of weight in the period of one month preceding his pneumonia, that he had imbibed alcohol excessively in the months preceding his pneumonia, and that the temperature differential from the surface to the bottom of the ditch was approximately only ten degrees (whereas Mr. Ziegler had testified that he estimated the differential at forty degrees), Dr. Keig answered that in his opinion and in all probability Mr. Ziegler caught pneumonia from the working conditions.

Dr. Robert Marshall, the doctor who first attended Mr. Ziegler on his hospitali-zation on July 17 and who cared for him before leaving for the service during the rest of the month of July and part of August, in response to a hypothetical question posed by counsel for Haggart, which was designed to determine whether alcoholism could have been the probable cause of the pneumonia, responded in the affirmative. He said he could not definitely trace the pneumonia to either the alcohol or the working conditions. He did, however, concede that he saw Mr. Ziegler on several occasions after his discharge from the hospital because of persistent pulmonary infections and conceded that he had included in his report a statement that Mr. Ziegler had begun complaining of pains in his right leg following his discharge from the hospital. This was before his second hospitalization on October 11, 1961, at which time he was diagnosed as having pneumonia and thrombophlebitis.

Dr. Walter Dailey testified that he first saw Mr. Ziegler on October 3, 1961, when Mr. Ziegler's regular doctor, Dr. Marshall, was called into military service. Dr. Dailey was asked the following hypothetical question in an attempt to ascertain whether there was a causal connection between Mr. Ziegler's work and the pneumonia which was diagnosed on July 17, 1961. The question follows:

[A]ssume that Mr. Ziegler was working in the sewer ditch about sixteen feet deep from the surface, and that the temperature was cooler on the bottom of the ditch than it was on the surface, and that he went up and down from the surface to the bottom of the sewer, and that he was perspiring, and that he worked that week for a few days, and the following day he felt very sick, and that on July 17, 1961, at 3:15, he was admitted to the Deaconess Hospital and there his condition diagnosed as thrombopneumonia. Are you able to give an opinion that would enable you to state with reasonable medical certainty based on that hypothetical statement of fact whether or not this working condition caused or

contributed to the pneumonia, which was found on the 17th of July?

Dr. Dailey's answer:

My opinion is that those facts would be a causative factor in the production of the pneumonia.

Dr. Robert C. Painter, who examined Mr. Ziegler for the Workmen's Compensation Bureau, was posed the following hypothetical question:

And assume that Mr. Ziegler on or about the week of July 10 was working in a sewer that was about 16 feet deep and that the temperature was cooler at the bottom of the trench than the temperature at the surface of the ground, that in the trench he was perspiring and that he would change his work place from the bottom of the trench to the top of the surface–to the surface. Then located in the bottom of this trench was a pipe or sewer in which the claimant was working and in that sewer there was a draft coming through from the lift station to the end of the sewer pipe, and that in working this area he became perspired and cooled off and warmed up depending upon what part of the sewer he was in or whether he was on the surface or in the sewer. Now under those conditions would you be able to give an opinion whether or not such working conditions could cause the claimant here, Mr. Ziegler, to develop pneumonia.

Subject to questions raised by counsel for Haggart intended to point out that many other factors could cause pneumonia, the doctor answered:

I'm sure that in the situation that you outline, if the individual involved should undergo sufficient change in the environment and temperature and become chilled, this would very definitely be a possible predisposition to development of pneumonia.

And then in response to a hypothetical question designed to determine whether the thrombophlebitis was traceable to the pneumonia, he answered that he thought that the time element made it very definitely a complication of the pneumonia.

He later described the causes of thrombophlebitis as follows:

The primary causes are related to a patient who has been quiet over a period of time, too quiet perhaps, stasis, the flow of blood through the vein is not normal and the blood pools in the veins and these veins in themselves are somewhat incompetent and not normal. They are prone to develop blood clots and perhaps inflammation associated with these, and the other things that may contribute are injuries, trauma, infections * * *

He agreed on cross-examination that his opinion might be different if he accepted Dr. Dailey's estimate of the onset of the phlebitis as only one week prior to the second hospitalization.

Here it should be noted, however, that Dr. Dailey was merely estimating the onset of the phlebitis, without having seen the patient before October 3, 1961.

Mr. Ziegler's second hospitalization was from October 11, 1961, to October 18, 1961.

Dr. James Murray testified that in his opinion the pneumonia was not due to the working conditions. This opinion was not in response to a hypothetical question but to a question which asked him whether he had an opinion after reviewing all the medical records and hearing the testimony in the case. He answered, "Definitely, yes," to the following question: "[D]o you think that a weakened, resistant power of a Mr. Ziegler would be more probably the cause of pneumonia than the thermochanges?"

In response to a hypothetical question posed by counsel for Haggart designed to determine whether the thrombophlebitis was the result of the pneumonia, a question which included in its facts that nine weeks intervened between Mr. Ziegler's discharge from the first hospitalization due

to pneumonia and the time that he was seen by Dr. Dailey on October 3, 1961, and that Dr. Dailey diagnosed the onset of the thrombophlebitis as only one week earlier, Dr. Murray testified that he thought it was extremely unlikely that the thrombophlebitis was the result of the previous pneumonia.

There is other testimony on the part of persons called on behalf of Haggart which, summed up, is to the effect that Mr. Ziegler regularly frequented bars during the three months before his first hospitalization for pneumonia in 1961, and that while in the bars he consumed alcohol to excess. One of the witnesses testified that if Mr. Ziegler stayed with him throughout the night, he probably drank between ten and fifteen whiskeys per night; however, Mr. Ziegler denied that he ever drank ten to fifteen whiskeys and said that he usually drank no more than three to four beers. No testimony was submitted to show that Mr. Ziegler consumed alcohol to excess between the date that he left work ill, just before his first hospitalization for pneumonia, and the time of his second hospitalization for pneumonia and thrombophlebitis.

■ Viewing all of the evidence, not just that which we have recited or summarized in this opinion, in light of the substantial-evidence test, we hold that the Bureau's findings to the effect that in the course and scope of Mr. Ziegler's employment by Haggart he incurred pneumonia which ultimately brought on thrombophlebitis are sustained by the evidence.

We are also of the view that the evidence sustains the Bureau's finding that Mr. Ziegler is presently one hundred per cent disabled as a result of the pneumonia and the thrombophlebitis. Accordingly, we affirm the trial court's judgment affirming the Workmen's Compensation Bureau's decision.

STRUTZ, PAULSON and KNUDSON, JJ., concur.

TEIGEN, Chief Justice (dissenting).

I dissent.

The majority have established a rule in this case that the Supreme Court on an appeal from the district court in a Workmen's Compensation case, as it relates to a determination of the facts, is limited to determining whether there is substantial evidence to support the Bureau's findings of fact. I agree with this principle of law as to the scope of our review. However, this rule precludes a review in this case because the Bureau made no findings of fact when it made its permanent disability award. Bernardy v. Beals, 75 N.D. 377, 28 N.W.2d 374 (1947), cited by the majority, does not constitute precedent for ignoring procedural defects of this grave nature. In *Bernardy* the Workmen's Compensation Bureau did make brief findings of ultimate facts essential to its decision. These findings are set forth in the opinion and were found sufficient to show the basic facts upon which the Bureau based its decision. In this case we have no findings whatsoever in regard to the facts upon which the permanent award is based. Nowhere in the entire record submitted by the Bureau is there a finding by the Bureau that Ziegler's thrombophlebitis was causally connected to the pneumonia or to his work, or that they have permanently and totally disabled him.

Section 28–32–13, N.D.C.C., provides in part:

"* * * in a proceeding before an administrative agency, * * * the agency shall make and state concisely and explicitly its findings of fact and its separate conclusions of law, and the decision of the agency based upon such findings and conclusions. * * *"

In Hvidsten v. Northern Pac. Ry. Co., 76 N.D. 111, 33 N.W.2d 615 (1948), in construing this statute, this court said:

"This statute requires explicit findings. Explicit is defined by Webster's International Dictionary 2nd ed., as 'Not implied

merely, or conveyed by implication; distinctly stated; plain in language; clear; not ambiguous; express; unequivocal.' The language of the statute is precise. It does not allow a construction which would permit an inference or a presumption of favorable findings upon matters not mentioned by the Commission."

The court then found that certain designated findings of fact were not findings of fact at all but merely references to the evidence and do not, under the statute, constitute a basis for the agency's order. It held "under the express language of the appeal statute, Section 28-3219, supra [the same statute is now in effect as Section 28-32-19, N.D.C.C.], the order of the Commission in this case must be reversed." The court adopted the following syllabus in that case:

"4. Where the statute requires 'explicit' findings of fact, the granting of an application for a certificate of public convenience and necessity by the Public Service Commission does not give rise to an inference or a presumption that the Commission considered and made favorable findings upon matters, essential to the granting of the application but which are not mentioned in the Commission's findings of fact.

"5. Where the findings of fact of the Public Service Commission omit findings upon matters essential to the granting of a certificate of public convenience and necessity, a decision of the Commission, granting such certificate, is not supported by the findings of fact and under the provisions of Section 28-3219 NDRC 1943 must be reversed."

In another case, Kuhn v. North Dakota Public Service Commission (N.D.), 76 N.W.2d 171 (1956), this court reaffirmed its position when it held:

"5. If it appears upon an appeal from a determination of the Public Service Commission that any provisions of Chapter 28-32, NDRC 1943 providing for the scope and procedure of the trial have not

been complied with and the decision of the Commission is not supported by findings of fact, the case shall be remanded to the agency for such action as the court determines."

In the text of its opinion the court stated that:

"There are no findings as to what territory respondent had served up to the time of the hearing nor any finding upon the matter of convenience and necessity for limiting his zone to the extent the Commission ordered. Both the district court and this court were deprived of 'the value which attaches to the acumen and aptitude of skilled men whose business is to hear and determine such questions as the one involved—the value which attaches to their training and experience.' In re Theel Bros. Rapid Transit Co., 72 N.D. 280, 287, 6 N.W.2d 560, 564. Without the benefit of the conclusion of the Commission on the facts we are not justified in attempting to review the evidence to determine whether the court erred in not sustaining the order of the Public Service Commission as alleged in specification No. 6."

The above-cited cases involve appeals from the Public Service Commission. The Public Service Commission and the Workmen's Compensation Bureau are both administrative agencies of the State. Section 28-32-01, N.D.C.C.; Petition of Village Board of Wheatland, 77 N.D. 194, 42 N.W.2d 321; Schnoor v. Meinecke, 77 N.D. 96, 40 N.W.2d 803; Knutson v. North Dakota Workmen's Compensation Bureau (N.D.), 120 N.W.2d 880. Therefore, both are governed by the provisions of Section 28-32-13, N.D.C.C., requiring that they make findings of fact and the courts are governed as to the scope of review on appeal as to both by Sections 28-32-15 through 28-32-21, N.D.C.C.

The majority do not reject the interpretation of these statutes in the two cases I have cited nor do they distinguish them. *Bernardy* is not the precedent for a situa-

tion where no findings of fact whatever are made by the administrative agency. It is my opinion that the district court and, on appeal from its judgment, this court cannot review the sufficiency of the evidence to support the decision of the Bureau on an appeal from such decision where the Bureau has made no findings of fact or conclusions of law upon which it based its decision. I would, therefore, reverse the judgment of the district court with directions that the district court return the case to the Workmen's Compensation Bureau for further proceedings conformable to law.